<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Crim. No.: 06-911 (KSH) |
| v. |  |
| DAVID KIRKLAND,<br>    *Defendant*. | <u>OPINION</u> |

**I.  Background**

  Following a jury trial, defendant David Kirkland was convicted of conspiracy to transport and receive stolen goods in interstate commerce under 18 U.S.C. § 371 (count 1), as well as two substantive counts of interstate transportation of stolen goods under 18 U.S.C. §§ 2314 and 2 (counts 3 and 4). On October 2, 2009, Kirkland was sentenced to 216 months' imprisonment (comprised of 60 months on count 1 and 108 months on each of counts 3 and 4, with the latter running consecutively to each other and concurrently with count 1), followed by three years of supervised release. (D.E. 189.) He was also ordered to pay $2,257,931.83 in restitution. (*Id.*) The judgment was affirmed on appeal. (D.E. 237.)

  Kirkland is currently incarcerated at FCI Schuylkill and is scheduled for release on July 6, 2023, preceded by release to home confinement on January 1, 2023. (D.E. 246, Ex. B.) On June 30, 2020, he filed a *pro se* letter application seeking compassionate release based on the COVID-19 pandemic, the conditions at FCI Schuylkill, and his asserted medical conditions, *i.e.*, hypertension and high cholesterol. (D.E. 241.) He also sought waiver of the administrative exhaustion requirement. The Federal Public Defender subsequently entered an appearance on behalf of Kirkland (D.E. 245), and supplemented his motion for compassionate release, requesting a reduction in sentence to time served or release to home confinement on the ground that, taken

1

together, his obesity, uncontrolled hypertension, and age (53), the COVID-19 pandemic, and the conditions of confinement and protocols at FCI Schuylkill constitute an extraordinary and compelling reason for the relief sought. (D.E. 246.) Kirkland further contends that the § 3553(a) factors support his release because he has served a "substantial percent" of his sentence and has made rehabilitative efforts by participating in numerous courses and maintaining "exemplary" conduct.

In opposing (D.E. 248), the government concedes that Kirkland's obesity could, standing alone, constitute an extraordinary and compelling reason for relief, but argues that FCI Schuylkill can effectively manage his medical conditions, and that the BOP and FCI Schuylkill have effective protocols in place to address the risk of COVID-19. The government further argues that consideration of the sentencing factors under 18 U.S.C. § 3553(a) does not support compassionate release in this case, and that to the extent Kirkland is seeking release to home confinement, the Court has no authority to grant that relief.

After the filing of the counseled motion, and after the government filed its opposition, Kirkland submitted four *pro se* letters invoking his efforts at rehabilitation, citing fear of the virus, and challenging the warden's use of quarantine and/or the special housing unit to contain the virus's spread. (D.E. 249-252.) Subsequently, in a letter dated February 16, 2021, which was received and docketed on February 26, 2012, Kirkland filed an "emergency renewed motion to reduce sentence" under 18 U.S.C. § 3582, in which he expanded on his concerns regarding the conditions of his confinement, including that, in December 2020, amid an outbreak of COVID-19 at the facility, he had been moved from the camp to the FCI and placed in isolation with inmates who had tested positive for the virus, including his immediate cellmate. (D.E. 253.) He described "squalid" conditions, inmates summoning emergency help that did not come, freezing temperatures, and no access to hygiene products or clean clothing. (*See id.* at 5.) He further

reiterated his concerns about contracting COVID-19 in light of the conditions of his confinement and the warden's management of the situation, as well as his fear of severe complications were he to contract the virus.

Upon receipt of Kirkland's "emergency" motion, the Court directed the government and defense counsel to supply current information about the conditions at FCI Schuylkill and FCP Schuylkill, specifically the "rate of COVID infection subsequent to the filing of counsel's submissions DE 246 and 248, current containment protocol, and the defendant's conditions of confinement in quarantine." (D.E. 254.) The government (D.E. 255) and defense (D.E. 256) filed responsive submissions addressing these issues, the substance of which is addressed in greater detail below. Of particular note, the government revealed that Kirkland has now received both doses of the Pfizer-BioNTech Covid-19 vaccine, the first on February 9, 2021, and the second on March 2, 2021. Subsequent to these filings, Kirkland filed another *pro se* letter, in which he takes issue with inmates who previously tested positive for the virus being brought back to his unit after 90 days and raises his concerns about the risks of reinfection of other inmates, virus variants, and the conditions and practices at FCI Schuylkill. (D.E. 257.)

Having reviewed the foregoing submissions, the Court decides this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer,* 573 F.3d 151, 154 (3d Cir. 2009). The motion will be denied.

**II.     Legal Standard**

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797-98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). Relevant here, 18 U.S.C. § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the

3

> lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> [. . .]
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The United States Sentencing Commission's policy statement permits a court to reduce a term of imprisonment under § 3582(c)(1)(A) where extraordinary and compelling reasons warrant the reduction, the defendant is not a danger to the safety of any other person or to the community under 18 U.S.C. § 3142(g), and release would comport with consideration of the § 3553(a) factors. U.S. Sent'g Guidelines Manual ("USSG") § 1B1.13 (U.S. Sent'g Comm'n 2018); *accord United States v. Dunich-Kolb*, 2020 WL 6537386, at *2 (D.N.J. Nov. 5, 2020) (McNulty, J.) (summarizing requirements for compassionate release under § 3582(c)(1)(A)).

### III. Discussion

#### A. Administrative Exhaustion

As the Third Circuit has explained, "[a] prisoner may file a motion for compassionate release with the sentencing court 'after [he or she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf **or** the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, **whichever is earlier**." *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)). The record shows that Kirkland, through counsel, applied to the warden of FCI Schuylkill on August 7, 2020, seeking either release to home confinement or compassionate release. (D.E. 246, Ex. A.) According to the government, defense counsel has

4

represented that the warden denied this request, although it is unclear when. (*See* D.E. 248, at 1, 4.) In any event, more than 30 days have elapsed since Kirkland's request to the warden. His motion is properly before the Court.

### B. Substantive Standards for Compassionate Release

#### 1. Extraordinary and Compelling Reasons

Congress directed the Sentencing Commission to define the meaning of the statutory term "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t). The application notes to the Sentencing Commission's relevant policy statement provide that extraordinary circumstances exist in specified circumstances involving the defendant's medical condition, age, or family circumstances. USSG § 1B1.13, Application Note 1(A)-(C).[1] Here, Kirkland has invoked medical conditions as the basis for his request. A medical condition may give rise to extraordinary and compelling reasons where the defendant is:

>   (I)   suffering from a serious physical or medical condition,
>
>   (II)  suffering from a serious functional or cognitive impairment, or
>
>   (III) experiencing deteriorating physical or mental health because of the aging process,
>
>   that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, Application Note 1(A)(ii). Although this policy statement has not been updated since the passage of the First Step Act and, as such, addresses compassionate release motions brought by the BOP rather than by the defendant personally, it remains "useful guidance" in determining a defendant's eligibility for such relief while not constraining the Court's

---

[1] The application notes also contain a catchall provision. *See id.* at Application Note 1(D) ("As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

"independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c)(1)(A)." *United States v. Alexander*, 2020 WL 2507778, at *3 (D.N.J. May 15, 2020) (Wolfson, J.) (quoting *United States v. Rodriguez*, 451 F.Supp.3d 392, 397 (E.D. Pa. Apr. 1, 2020) (internal quotation marks omitted)).

As a practical matter, applying the policy statement's language about extraordinary and compelling reasons calls for an assessment of the record evidence of Kirkland's medical conditions and the likelihood he will contract COVID-19 in the institution in which he is incarcerated. *See United States v. Moore*, 2020 WL 4282747, at *3 (D.N.J. July 27, 2020) (McNulty, J.).

First, Kirkland's medical conditions: he cites obesity, hypertension, and his age. The medical records supplied to the Court do indeed reflect Kirkland's hypertension (which is being treated with medication) and obesity.[2] (D.E. 246, Ex. C.) Courts, including in this district, have looked to the Centers for Disease Control's classifications in assessing whether a defendant has shown extraordinary and compelling reasons for compassionate release based on COVID-19. *See, e.g.*, *Dunich-Kolb*, 2020 WL 6537386, at *5-6; *United States v. Dent*, 2020 WL 4783921, at *3-4 (E.D. Mich. Aug. 17, 2020). The CDC classifies hypertension and obesity as conditions that can make a person more likely to become severely ill from COVID-19. CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (page last updated March 29, 2021) (last

---

[2] Individuals with normal blood pressure have systolic blood pressure below 120 mm Hg and diastolic blood pressure below 80 mm Hg. CDC, *High Blood Pressure Symptoms and Causes*, https://www.cdc.gov/bloodpressure/about.htm (page last reviewed May 19, 2020) (last visited April 19, 2021). Obesity is defined as a BMI of at least 30 kg/m$^2$ but less than 40 kg/m$^2$. CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity (page last updated March 29, 2021) (last visited April 19, 2021).

visited April 19, 2021).³ The CDC further reports that the risk of severe illness from the virus increases with age. *See* CDC, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (page last updated April 16, 2021) (last visited April 19, 2021). Taken together, Kirkland's conditions suggest an increased vulnerability to severe effects if he were to contract the virus, which weighs in favor of his request. *See United States v. Ware*, 2020 WL 6707943, at *6 (D.N.J. Nov. 12, 2020) (Vazquez, J.) (observing that movant's obesity, asthma, and hypertension presented increased risk).

But – and importantly here – the Court also considers the likelihood of Kirkland contracting COVID-19 at the institution in which he is incarcerated. The numbers, standing alone, paint an unfavorable picture. As of the date of this writing, FCI Schuylkill reports one active inmate case and no active staff cases. BOP, COVID-19 Coronavirus, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited April 19, 2021); *see also* D.E. 255 (government reporting that, as of March 5, 2021, the BOP reported 70 active inmate cases). However, 560 inmates and 73 staff are listed as having recovered. This means 561 inmates either have or had the virus, indicating one or more significant outbreaks at the facility. And, as of March 8, defense counsel reported that the BOP has stated that both the camp and the medium security facility "are actively receiving new inmates" and that the number of positive cases would "increase in the coming days due to a recent spike in infections." (D.E. 256, at 1.)

FCI Schuylkill also reports that it has administered 1033 tests, with 576 positive results. BOP, COVID-19 Coronavirus, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited April 19, 2021).⁴ Nearly all of these cases have arisen in just the last several months; as of mid-

---

3   To the extent Kirkland's initial *pro se* submission cites high cholesterol, this condition is not on the CDC's list.
4   With respect to the testing figures, the BOP website states that "the number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than

November, it appears there had been only a single inmate case at the facility. *Ware*, 2020 WL 6707943, at *6 (discussing COVID-19 figures at FCI Schuylkill as of that time); *see also* D.E. 256, at 1 ("[S]ince the defense supplemented Mr. Kirkland's original motion [in August 2020], over 530 inmates and staff tested positive for the virus."). These figures undermine the government's argument that measures taken by the BOP to reduce the virus's spread, including at this facility, have been working. Kirkland's description of the time he spent in quarantine beginning in December 2020—including the absence of hygiene products—along with the defense's description, based on a conversation with the BOP, of the "open air" environment at the camp and attendant inability to isolate positive cases, reinforce the problematic nature of the conditions for mitigating the spread of the virus.

But as applied to Kirkland, the protocols have worked. With respect to the period of quarantine that is the subject of his *pro se* submissions and emergency motion, the government reports that while Kirkland is typically housed at the prison camp at Schuylkill, the quarantine facility is located within the medium-security facility. (D.E. 255.) Because of a potential close-contact exposure to a COVID-positive individual, Kirkland was placed in the quarantine facility from December 23, 2020 to January 29, 2021, and tested negative on entry, 14 days later, and, most recently, on March 2, 2021. The government also reports that camp inmates must test negative before returning from the quarantine facility, which means Kirkland has tested negative at least four times.[5]

---

once," and the "number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility." *Id.*

[5]  As of Kirkland's most recent *pro se* submission, he has now tested negative six times. (D.E. 257.) In the same submission, he suggests that inmates previously quarantining were being permitted to return to his unit without being tested – after 90 days. CDC guidelines indicate that isolation of those who have tested positive can generally end far earlier. CDC, *When You Can be Around Others After You Had or Likely Had COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html (page last updated March 12, 2021) (last visited April 19, 2021) (10 days since onset of symptoms, 24 hours fever-free without use of

Most significantly, Kirkland has now received both doses of the Pfizer-BioNTech Covid-19 vaccine, the first on February 9, 2021, and the second on March 2, 2021. (*See* D.E. 255, 256.) As the government observes, there is evidence this vaccine is highly effective. CDC, *Pfizer-BioNTech COVID-19 Vaccine Overview and Safety*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (page last updated April 16, 2021) (last visited April 19, 2021) ("Based on evidence from clinical trials, the Pfizer-BioNTech vaccine was 95% effective at preventing laboratory-confirmed COVID-19 illness in people without evidence of previous infection."). Moreover, the government relates that the BOP has administered the vaccine to 35 camp inmates, all of whom are in Kirkland's wing. Although Kirkland has conditions that the CDC recognizes to present increased risk to him were he to contract COVID, in view of the particular steps the BOP has taken with respect to him specifically, including offering and completing a full vaccination course, his fear of contracting the virus does not rise to the level of an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A) and the application notes to USSG § 1B1.13.

### 2. Section 3553(a) Factors and Dangerousness

Even assuming that Kirkland has demonstrated the existence of an extraordinary and compelling reason for the relief sought, the Court nevertheless cannot conclude that a reduction in sentence would be appropriate. Under § 3582(c)(1)(A), the Court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to the extent applicable, *see United States v.*

---

medication, and other COVID-19 symptoms improving; continued loss of smell or taste need not delay end of isolation). More generally, Kirkland's most recent letter expresses various concerns without accounting for the mitigating effects of the vaccine he received (discussed *infra*); instead, he positions the vaccine as an indication of personal responsibility for which he should be rewarded by a resentencing to time served. As discussed herein, the Court concludes that a reduction in sentence is not warranted.

*Pawlowski*, 967 F.3d 327 (3d Cir. 2020), and whether the defendant would be a danger to the safety of any other person or to the community under 18 U.S.C. § 3142(g).

Section 3553(a) directs the Court to impose a sentence that is sufficient, but not greater than necessary, to further the purposes of sentencing, *i.e.*, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(D). Additionally, the Court takes into account, *inter alia*, the nature and circumstances of the offense and the defendant's history and characteristics. *Id.* § 3553(a)(1). Evaluating dangerousness under 18 U.S.C. § 3142(g) also involves, in relevant part, assessing the nature and circumstances of the offense, the defendant's history, and the "nature and seriousness of the danger to any person or the community" that would be posed by his release.

Kirkland's offense involved a long-running scheme to break into homes and steal and later sell valuables; he victimized hundreds of people, six of whom testified at sentencing to the devastating impact of Kirkland's conduct on their lives. In discussing the nature of Kirkland's offense, the Court observed that the "sheer volume and the sheer perniciousness" of the offense was "staggering." (D.E. 193, Sent'g Tr. 187:25-188:1.) The sentence imposed reflected the severity of Kirkland's offense and impact on his victims, the need to provide just punishment for that conduct, and the need to protect the public from further crimes committed by him – particularly given that Kirkland planned this crime spree while federally incarcerated on earlier racketeering charges for a long-running scheme very similar to the one underlying his conviction here.

At sentencing, the Court noted that Kirkland had not expressed genuine remorse for his actions or victims. While Kirkland appears to have made some efforts at rehabilitation, completing numerous courses during his incarceration, he continues to describe his conduct as

"non-violent," and expresses regret in only the most general terms. (*See* D.E. 249, at 3; D.E. 253, at 2.)  The government's evidence at trial described a careful targeting of the victims' homes based on their location and structure and the comings and goings of the family members, and the condition of the burglarized homes revealed the perpetrators' brute strength in bursting open perimeter doors and their ability to efficiently disable the house alarms right afterwards. This brash and cunning criminal conduct amounts to a menace that violated the peaceful existence of numerous people who were complete strangers to Kirkland, with a lasting effect on them.  All this escapes Kirkland, it appears, but serves now to weigh against him when the Court considers, as it must, the factors in § 3553(a).  The Court cannot now conclude on this record that those sentencing factors – and in particular the seriousness of the offense and the need to protect the public – support resentencing him or that release would be appropriate under 18 U.S.C. § 3142(g).[6]

### IV. Conclusion

For the reasons set forth above, Kirkland's motions will be denied.  An appropriate order will issue.


Dated:  April 20, 2021                                     /s/ Katharine S. Hayden
                                                                         Katharine S. Hayden, U.S.D.J.

---

[6] This ruling makes it unnecessary to consider the information concerning a proposed release plan that Kirkland proposes (D.E. 258) to submit under seal.